IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

AUGUSTUS SIMMONS,                       )
                                        )
        Plaintiff                       )       Case No. 2:17-cv-00996
                                        )
vs.                                     )
                                        )       RICHARD A. LANZILLO
ROBERT GILMORE, M. ZAKEN,               )       UNITED STATES MAGISTRATE JUDGE
LEGGET, SMITH, SHRADER, LT.             )
KENNEDY, S. LONGSTRETC,                 )
YOUNKIN, CHIOVITTI, D. BENNER,          )       MEMORANDUM OPINION ON
HIMES, DORINA VARNER, J. DUPONT,        )       DEFENDANTS' MOTION FOR
T. SHAWLEY, CORE, BROOKS,               )       SUMMARY JUDGMENT
CARTER, GILLESPIE, HENNESSEY,           )
ALBONDE, IMHOLF,                        )       ECF NO. 112
                                        )
        Defendants                      )
                                        )

I.      Introduction

        Plaintiff August Simmons (Simmons)[1], an inmate currently incarcerated at the State

Correctional Institution at Greene (SCI-Greene), commenced this action against several staff

members at that facility, alleging violation of his constitutional and statutory rights. The Court

previously dismissed several of his claims. *See* ECF No. 45. The remaining Defendants have moved

for summary judgment on the remaining claims. ECF No. 112. For the reasons that follow, the

Defendants' motion will be GRANTED in part and DENIED in part.[2]

---

[1] In his initial Complaint, Simmons referred to himself "Augustus Simmons Enoch," and in other filings as the "Reverend August Simmons Enoch." *See, e.g.*, ECF Nos. 5, 50, 68. The DOC's inmate locator lists only "Augustus Simmons," and includes no results for "Augustus Simmons Enoch." *See* http://inmatelocator.cor.pa.gov (last consulted on January 14, 2021). For consistency, the Court will refer to plaintiff as "Simmons."

[2] All parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case. *See* ECF Nos. 23, 24, 31, and 40.

II.     Factual Background

The following factual background is taken from the Defendants' Concise Statement of Material Facts (ECF No. 114) and Simmons Response to the Defendants' Concise Statement.  ECF No. 124.  Any disputes are noted.

Prison personnel denied Simmons a haircut on December 31, 2016.  *See* ECF No. 115-1, p. 2.  This denial, he claims, violated his religion.  ECF No. 114, ¶ 1.  The Defendants maintain he was denied a haircut on that date because he had not submitted a request for one, as required by institutional policy.  *Id.*, ¶ 3.  Simmons contends he submitted the request slip, but that it was rejected because it "wasn't nice enough."  ECF No. 123, ¶ 2.  He received a haircut on January 14, 2017.  *See* ECF No. 115-2, p. 18.

A few weeks later, on January 15, 2017, Simmons received a misconduct for using abusive or obscene language, refusing to obey an order, and threatening a Department of Corrections employee after Simmons refused to return some cleaning equipment.  ECF No. 114, ¶ 4.  The misconduct form is part of the record.  ECF No. 115-1, p. 6.  It relates that Simmons, upon being ordered to return the cleaning equipment, said "fuck you, this ain't no Holiday Inn.  That's why cops get shot in the face."  *Id.*  Simmons disputes this and, instead, states that he only responded, "my bad," when told to turn over the cleaning supplies.  ECF No. 123, ¶ 4.  He claims the misconduct charge was fabricated in its entirety in retaliation for his filing of the grievance about the denial of his haircut.  *Id.*  Simmons maintains that he "was cleaning his cell when he was verbally assaulted by Sgt. Younkin only minutes after c/o Brooks had passed out cleaning material."  ECF No. 124, ¶ 4.  Simmons was found guilty of this misconduct.  ECF No. 114, ¶ 5; ECF No. 124, ¶ 5.

That same day, January 15, 2017, Simmons was placed in a psychiatric observation cell (POC) after threatening self-harm.  ECF No. 114, ¶ 7.  Simmons explains that he "had just lost a close family member and couldn't communicate with this family because of this disciplinary status

2

so plaintiff [felt] like he wanted to die!" ECF No. 124, ¶ 7. Simmons filed a grievance concerning the conditions of the POC, claiming that the cell "smelled of urine and feces" and that he was not provided a bed or mattress. *Id.*, ¶ 15; *see also* ECF No. 115-1, p. 26 (Grievance No. 661147). The Defendants deny Simmons' allegations regarding the condition of POC, point out that he was housed there because of his suicidal ideations, and that he was given "all authorized items" during his three-day confinement. ECF No. 114, ¶ 16. Simmons disputes this, claiming he was left naked and cold in the cell. ECF No. 124, ¶ 16.

On March 18, 2017, Simmons again attempted to get a haircut, but his request was denied. ECF No. 114, ¶ 16; ECF No. 124, ¶ 16. Simmons claimed the denial of this service led to a "dry scalp" condition, and therefore violated his religious dictates of health and personal hygiene. ECF No. 124, ¶ 16. The next day, according to Simmons, Defendant Core "swore about immigrants" and "told the Plaintiff to write [his comments] down." ECF No. 114, ¶ 21; ECF No. 124; ¶ 21. Defendants contend that Simmons received a haircut on April 2, 2017, but Simmons does not recall receiving a haircut on that date. *Id.*, ¶ 27; *id.*, ¶ 27.

The record reflects the following regarding Simmons' religious preferences and practices. In 2016, Simmons listed his religious preference as "Native American." *Id.*, ¶ 29; *id.*, ¶ 29. On December 23, 2016, Simmons changed his religious preference to "Divine Art of Scale (7%)." ECF No. 114, ¶ 30; *see also* ECF No. 115-1, p. 49. Simmons explained this preference:

> On August 7, 2016 was his official converstion (sic) date, but plaintiff did give notice to the D.O.C. till (sic) December 23rd 2016 which was meet (sic) with much resistance. At this time the fellowship of spiritual science was in its infinit (sic) stages and was called the Divine Art of the Scale, which still represents the 7% who see the truth. Now in the more comprehensive 2nd edition of the Doctrine and Ethics of a Seeker which is still being written reflects that the Divine Art of the Scale is the teaching within spiritual science known as Advance Spiritual Science.

ECF No. 124, ¶ 30.

On October 4, 2018, Simmons changed his religious identification to "Fellowship of Spiritual Science."  ECF No. 114, ¶ 31; ECF No. 124, ¶ 31.  The Defendants state that Simmons is the founder of this religion and Simmons identifies himself as such: "plaintiff is the founder and First herald (Phoenix herald) of 7 Phoenix heralds that will later be elected to govern the clergy of the fellowship of Spiritualism."  ECF No. 124, ¶ 31.[3]  On April 12, 2018, Simmons requested official recognition of his religion by the DOC.  ECF No. 114, ¶ 34; ECF No. 124, ¶ 34; *see also* EFC No. 115-1, p. 57 ("Religious Accommodation Request Form").  In addition to official recognition of his religion, Simmons asked for accommodations such as a special diet, but he made no specific request for religiously sanctioned haircuts.  *Id.*, ¶ 32.  Simmons acknowledges that he did not request an accommodation for haircuts because "haircuts were established in policy as accessible.  Haircuts only became an issue when plaintiff tried to access haircuts and was systematically denied haircuts in retaliation for grievances filed."  ECF No. 124, ¶ 32.

As the founder of his religion, Simmons has authored a monograph entitled *Doctrine and Ethics of a Seeker*.  *See* ECF No. 115-2, pp. 2-216.  This work includes what Simmons calls a "historical summary" in which he admits that, prior to his conversion, he "ran wild in prison" and was a "gang member."  ECF No. 124, ¶ 37.  The Defendants point out, and Simmons does not dispute, that in the past he was incarcerated in the institution's Security Threat Group Management Unit (STGMU) for gang-related activities.  ECF No. 114, ¶ 37; ECF No. 124, ¶ 37.  Simmons disputes that his more recent stays in the STGMU were related to gang activity.  ECF No. 124, ¶ 37.

---

[3] Simmons refers to himself as "The Most Reverend Magi, Prince Augustus Enoch" and "Prince Augustus Enoch, the Phoenix Awakened!! The Herald of the New Age."  ECF No. 114, ¶ 33; *see also* ECF No. 115-1, pp. 56, 73.  Simmons explains that "after devision (sic) of titles and a realization that 'prince' is a imperial title he changed (removed) prince from his name because we don't rule anyone, we just govern the fellowship of Spiritual Science from the Authority of the constitution of light.  I am known as the rev. (reverend) magi Augustus Osiris Enoch, the first herald of the new age.  In our doctrine we are all the Phoenix awakened when we find the light of light."  ECF No. 124, ¶ 33 (emphasis in original).

4

Simmons actively seeks donations and converts to his religion.  ECF No. 114, ¶ 38; ECF No. 124, ¶ 38.  Specifically, Simmons has admitted to attempting to convert eight other inmates to his self-proclaimed faith.[4]  *Id.*, ¶ 39; *id.* ¶ 39; *see also* ECF No. 115-1, p. 85.  Five of the inmates Simmons identifies as members of his faith are also identified by the DOC as "validated members of a security threat group, and one other is a suspected member of such a group."  ECF No. 114, ¶ 40.  Simmons acknowledges that "yes, some converts may be gang members."  ECF No. 124, ¶ 40.

Simmons' work, *Doctrine and Ethics of a Seeker*, sets out some of the beliefs and practices of his religion.  Styling himself as "Prince A. A. Enoch Herald of the New Age," Simmons' followers are expected to follow the "vows of Enoch," as Simmons interprets them.[5]  ECF No. 114, ¶¶ 43-44; ECF No. 124, ¶¶ 43-44.  The Defendants point out that haircuts are not mentioned as religious requirement in Simmons' work, but Simmons maintains that his religious requirements of "grooming" and "hygiene" include regular haircuts.  *Id*, ¶ 49; *id*, 49.

Simmons' pleadings also include allegations relating to the nature of the mental health treatment he received.  At all times relevant to this case, Simmons was assigned a "C" stability code.  *Id.*, ¶ 50; *id.* ¶ 50.[6]  This designation means that he was being provided with mental health treatment but had not been diagnosed as having a serious mental illness.  *Id.*  Simmons was seen by a prison psychiatrist on March 6, 2017, and by Psychology Services Associate Novak (Chiovitti) on April 17, 2017.  ECF No. 114, ¶¶ 51-52.  After both appointments, it was concluded that Simmons was not in need of any further psychiatric or psychological treatment.  *Id.*  The prison's Psychiatric Review

---

[4] In answers to interrogatories, Simmons identified seven inmates by name as converts/adherents to the Fellowship of Spiritual Science.  ECF No. 115-1, p. 85.  Simmons states that he is "still converting inmates to the Fellowship of Spiritual Science, many like the few named do not or didn't want to be publicly known so they could remain free from institutional retaliation."  ECF No. 124, ¶ 39.

[5] Simmons writes that "I want you to understand something.  I was a major gang leader (cult member) that didn't need for anything."  ECF No. 115-1, p. 78.

[6] Simmons reports that, as of September 14, 2020, he was still assigned a "C" code.  ECF No. 124, ¶ 50.

Team (PRT) met with Simmons on April 26, 2017 for a regular scheduled review. *Id.*, ¶ 53. Simmons disputes this, stating that he reported "night terrors" and sleep loss but received no treatment for either. ECF No. 124, ¶ 51. He also denies seeing Defendant Novak on April 17, 2017 and does not recall meeting with the PRT. ECF No. 124, ¶¶ 52-53. The Defendants contend that Simmons continued to receive regular psychiatric care, including being seen by psychiatric providers on June 8, 2017, June 15, 2017, June 28, 2017, and July 28, 2017. ECF No. 114, ¶¶ 54-57. Simmons does not recall the June 8, 2017 consultation and denies that he met with Defendant Novak on June 15, 2017. ECF No. 124, ¶¶ 54-55. He does not dispute meeting with Defendant Novak, during which he reported difficulties sleeping and the hearing of voices. ECF No. 114, ¶ 56; ECF No. 124, ¶ 56.

During the month of June, 2017, while Simmons' psychiatric needs were being assessed, Simmons was issued several misconducts. First, he received a misconduct on June 14, 2017 for threatening a prison employee, using abusive language, and refusing to obey an order. *Id.*, ¶ 58; *id.* 58. Simmons acknowledges that he pleaded "no contest" to the misconduct and was found guilty but contends that the misconduct was fabricated. ECF No. 124, ¶ 57. Simmons was issued another misconduct that same day for similar infractions: threatening to kill another person and using abusive language. ECF No. 114, ¶ 60. Simmons acknowledges this misconduct and his plea of "no contest," but again calls it a fabrication. ECF No. 124, ¶¶ 60-61. Simmons received a third misconduct on June 29, 2017, based on his refusal to obey an order and engaging in unauthorized group activity in trying to prevent other inmates from returning their meal trays. ECF No. 114, ¶ 63. Simmons acknowledges that he received a misconduct on that date but "does not recall much of the said events but did receive (sic) a misconduct for holding his food trey (sic) after waiting to

6

receive a blood test." ECF No. 124, ¶ 63.  Simmons received 15-days disciplinary custody for this

misconduct.  He did not appeal any of these misconduct charges.[7]  ECF No. 114, ¶ 69.

III.     Procedural History

     The procedural history of this litigation is lengthy but simply stated.  Simmons began this

action on August 2, 2017, with the filing of a motion to proceed *in forma pauperis*.  ECF No. 1.  His

Complaint was docketed on August 7, 2017.  ECF No. 4.  Twenty-one individuals were identified as

defendants: R. Gilmore, M. Zaken, Legget, Smith, Shrader, Lt. Kennedy, S. Longstretch, Younkin,

Chiovitti, D. Benner, Himes, Dorina Varner, J. DuPont, T. Shawley,  Core, Brooks, Carter,

Gillespie, Hennessey, Albonde, and Imholf.  ECF No. 4, ¶¶ 7-22.  Simmons' original complaint

consisted of seven claims.  *Id.*, ¶¶ 113-137.

     Some but not all Defendants filed a motion to dismiss some but not all of Simmons' claims.

ECF No. 21.  The Court granted that motion, dismissing Simmons' First Amendment retaliation

claim and his claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA")

(Count II), his due process claims (Counts IV, V), his supervisory liability claim (Count VI), and his

Eighth Amendment sexual harassment claim (a component part of Count VII).  ECF No. 45.

Except for his religion-based claims (Count II), all of the foregoing claims were dismissed with

prejudice.  *Id.*  The Court permitted Simmons to file an amended version of his First Amendment

and RLUIPA claims, directing him to "more clearly define" the basis for these claims.  *Id.*, p. 2.

Simmons then filed an amended Count II on April 11, 2019.  ECF No. 46.

     The Defendants filed an Answer denying the allegations stated in the remaining counts of

the original Complaint (ECF No. 4) as well as Simmons' amended Count II (ECF No. 46).  *See* ECF

---

[7] In his responsive Concise Statement, Simmons denies that he failed to appeal these misconducts, arguing that "I appealed one of the three grievances which Defendants mentioned themselves in the beginning of their Concise Statement of Facts for misconduct B937660." ECF No. 124, ¶ 69. Simmons is incorrect. Misconduct B937660 was an early misconduct charged against him on January 15, 2017. *See* ECF No. 114, ¶ 4; *see also* ECF No. 115-1, p. 6. He has not disputed, therefore, that he failed to appeal the three misconducts issued in June of 2017.

No. 48. A lengthy period of discovery began on these remaining claims on April 23, 2019. *See* ECF No. 49. While discovery was pending, Simmons filed a motion for leave to file yet another amended complaint. ECF No. 78. The Court granted his motion but construed his proposed filing as a supplement to the operative complaint. ECF No. 79. In this supplement, Simmons brings a defamation claim against two Defendants, alleging that they called him a "a high-ranking gang member." ECF No. 80, ¶ 5. These Defendants, he contends, believe that the religion he founded is an attempt at gang leadership. *Id.* Simmons asserts that this and other statements made in court filings violated his constitutional rights "to be free from defamation of his character and his religion the Fellowship of Spiritual Science." *Id.*, ¶ 7. Defendants answered the supplemental pleading, denying Simmons' claims and then filed a motion for summary judgment on all the remaining claims. ECF No. 81; ECF No. 82. Simmons again sought to amend his Complaint, but this time the Court denied his motion. ECF No. 89; ECF No. 89.[8]

The Defendants' renewed their request for summary judgment, filing a motion, brief in support and concise statement of material facts. ECF Nos. 112, 113, and 114. Simmons then filed a response in opposition, a brief in opposition and a responsive concise statement. ECF Nos. 122, 123, 124. The Defendants filed a reply brief. ECF No. 126. The motion has thus been fully briefed and is now ripe for disposition.

IV.    Construction of the Remaining Claims

Before turning to a consideration of the remaining claims on summary judgment, it is necessary to ascertain their nature; necessary because the Complaint and its supplements implicate

---

[8] Before the Court took up the instant motion for summary judgment, the Defendants filed a motion for sanctions. ECF No. 82. They asserted that Simmons had improperly forged documents he submitted in response to their motion and asked for dismissal of this lawsuit as a sanction. *Id.* The Court terminated Defendants' motion for summary judgment pending resolution of the sanctions issue. A hearing was conducted on the issue of sanctions. ECF No. 107. After reviewing the factors set out in *Poulis v. State Farm Fire and Casualty Co.,* 747 F.2d 863 (3d Cir. 1984), the Court granted Defendants' motion, in part. Although the sanction of dismissal was not warranted, the Court struck the questionable document and prohibited Simmons from relying on that document in any future proceedings. ECF No. 109, p. 8. The Court then reset the deadline for the filing of summary judgment motions. ECF No. 110.

various constitutional provisions which are conglomerated within each Count and are often

unmoored from any supporting factual assertions. Nevertheless, Simmons allegations will be

liberally construed. *Gannaway v. Stroumbakis*, 2021 WL 128918, at *1 (3d Cir. Jan. 14, 2021) (citing

*Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, L. Ed. 2d 1081 (2007)). His submissions are read

to "raise the strongest arguments suggested therein." *Hena v. Vandegrift*, 2020 WL 1158640, at *9

(W.D. Pa. Mar. 10, 2020) (citing *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). Yet, "a forgiving

interpretation does not render immune from dismissal or summary judgment claims that lack

procedural or factual viability." *Id.* While the Court has a duty to liberally construe a pro se litigant's

filings, the Court does not have a duty to add arguments that a litigant did not include in their

pleading. *See, e.g., Carrero v. Metzger*, 2018 WL 4567124, at *2 (D. Del. Sept. 24, 2018) (citing *Castillo

v. McCain*, 2017 WL 1232444, at *4 (E.D. La. Feb. 9, 2017) ("It is neither required nor appropriate

for a court to scour a state-court record to divine the issues that a petitioner is attempting to raise in

his petition."). The opposite is true as well: where a pro se prisoner uses specific legal terminology

to anchor his claim within a widely recognized cause of action, and pleads facts to back that up, they

are stuck with their allegation as pleaded and the Court need not expand on it. *McBride v. Putnam*,

156 Fed. Appx. 531, 533 (3d Cir. 2005) (noting that pro se litigants have an obligation to present

issues for review).

      A.     Count I – First Amendment Retaliation

      The Court construes Simmons' allegations at Count I as a First Amendment Retaliation

claim only. *See* ECF No. 4, ¶¶ 113-117. Defining the strictures of this claim is necessary before

proceeding further. First, despite this claim being brought against "all Defendants," the Defendants

interpret Count I as applying only to Defendants Younkin, Gillespie, Core, Brooks, Carter, and

Kennedy. *See* ECF No. 113, p. 3. Simmons does not dispute that Count I is brought against those

Defendants specifically. *See* ECF No. 122-1, p. 8 (identifying "First and Eighth Amendment claims"

as being brought against Defendants Younkin, Gillespie, Core, Brooks, Carter, and Kennedy). So then, this Count is understood to apply only to that group of Defendants.

Second, the Court will construe this claim as alleging only a First Amendment retaliation violation, despite Simmons' invocations of the Eighth and Fourteenth Amendments. *See, e.g.*, ECF No. 4, ¶ 115-156. Through his own words, Simmons has pleaded that the Defendants "acted against Plaintiff for filing grievances" by filing a misconduct charge against him. ECF No. 4, ¶¶ 114-115. The result of that misconduct was confinement to "a more harsh RHU envirement, lossing his normal routen privileges such as named in Complaint and was denied showers, yard and placed in a dirty cell for a long period of time." *Id.*, ¶ 115 (misspelling in original).

Although Simmons purports to base this claim in the Eighth Amendment and the Defendants analyze it as such, the Court disagrees with that construction. Simmons specifically pleads that the Defendants retaliated against him by the filing of a misconduct charge, resulting in a series of unfortunate events. *Id.* He also states that they conspired to "retaliate, fabricate and file misconduct." *Id.* Simmons has not pleaded a stand-alone Eighth Amendment claim about the conditions of his confinement. Instead, he only pleads that he was subjected to unsatisfactory cell conditions because of the Defendants retaliatory actions.

Nor will the Court construe this Count as raising a due process claim under the Fourteenth Amendment. *See, id.*, ¶ 116. Simmons pleads that the Defendants purportedly violated his Fourteenth Amendment rights "when defendants filed a false misconduct report against Plaintiff in retaliation for Plaintiff filing his grievances against staff." *Id.* Here again, Simmons has not pleaded a stand-alone Fourteenth Amendment due process claim, but instead conflates such a claim with his underlying First Amendment retaliation claim. Therefore, the Court will construe the claim at Count I as a First Amendment retaliation claim only, which is a "separate claim … and therefore

must be separately grieved."[9] *Shifflett v. Korszniak*, 934 F.3d 356, 366 (3d Cir. 2019) (citing *White v. Napoleon*, 897 F.2d 103, 111-12 (3d Cir. 1990)).

      B.      Count II – 1st Amendment Retaliation; Free Exercise Claim; RLUIPA Claim

Count II is similarly pleaded but will be differently construed.  From the outset, Simmons himself characterizes this claim as one of retaliation: "II.  Retaliation by SCI Greene Correctional Staff."  ECF No. 46, p. 1.  He charges Defendant Younkin with perpetrating a "campaign of retaliation" and states that other Defendants "retaliated against Plaintiff for his grievances filed against staff."  *Id.*, ¶¶ 3, 5.  This Amended Count pleads that Defendant Hennessey denied Simmons haircuts "for filing grievances against staff," and that Defendant Albonde allegedly told Simmons that "as long as you keep complaining my friend you'll never get haircuts."  *Id.*, ¶¶ 6, 8.  Simmons also contends that Defendants Gilmore and Zaken were aware of "retaliation by correction staff." *Id.*, ¶ 12.  And Simmons specifically links the filing of grievances with the retaliatory action of denying him haircuts.  *Id.*, ¶ 4 ("This is the point when plaintiff knew for a fact that not only were his grievances causing retaliation but also his religious belief.").  Thus, this Count will be construed as a First Amendment retaliation claim based on the filing of grievances.

Although a generous interpretation, this Count will also be construed as one alleging a violation of Simmons' right to freely exercise his religion under the First Amendment.  For example, Simmons alleges that the Defendants retaliated against him for the filing of grievances "but also for his religious belief."  *Id.*  He also claims that he was retaliated against for his "religious expression." *Id.*, ¶ 5.  Defendant Albonde allegedly told Simmons, "we don't care how or what your religion practices" in denying him access to the barbershop.  Finally, and in a conclusory fashion, Simmons

---

[9] Although in rare cases prisoners will not be required to file a grievance for a retaliation claim if they fear further retaliation, *see Rinaldi v. United States*, 904 F.3d 257, 267 (3d Cir. 2018), that is not the case here. Simmons does not specifically allege that he feared further retaliation, and the extreme facts of *Rinaldi*—overt threats of violent retribution—are not present here. *See Shifflett v. Korszniak*, 934 F.3d 356, 366 (3d Cir. 2019).

pleads that "there (sic) denial of haircuts violates these religious precepts and plaintiff religious right to express his religion as a spiritual scientist." *Id.*, ¶ 11.  Given this, the Court will construe Count II as also bringing a Free Exercise claim against the Defendants.

Simmons' claim under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.*, (RLUIPA) is clearly stated in this Count.  *See* ECF No. 4, ¶ 119.

> C. Count III, Count VII, and Supplemental State Court Claim – Eighth Amendment deliberate indifference, 1st Amendment retaliation, denial of exercise, and defamation.

Count III is more straightforward, alleging an Eighth Amendment deliberate indifference claim against Defendant Chiovitti.  *See* ECF No. 4, ¶¶ 121-124.  Although a portion of Count VII has been dismissed, a First Amendment retaliation claim for the filing of grievances (*Id.*, ¶ 135) and an Eighth Amendment claim based on the denial of a "significant amount of daily exercise which still continues to this day" remain.  *Id.*, ¶ 136.  Finally, Simmons brings a supplemental claim of defamation.  ECF No. 80.

V.     Standards of Decision

> A.     Motions for Summary Judgment

Federal Rule of Civil Procedure 56(a) requires the court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Under this standard "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether a genuine issue of material fact remains for trial, a court must view the record and all reasonable inferences to be drawn therefrom in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988). To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. Instead, once the movant satisfies its burden of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party must go beyond his pleadings with affidavits, depositions, answers to interrogatories or other record evidence to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Further, under Rule 56, a defendant may seek summary judgment by pointing to the absence of a genuine fact issue on one or more essential claim elements. The Rule mandates summary judgment if the plaintiff then fails to make a sufficient showing on each of those elements. When Rule 56 shifts the burden of production to the nonmoving party, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. *See Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

B.    Pro Se Litigants

The summary judgment standard, as recounted above, "is somewhat relaxed with respect to pro se litigants. Where a party is representing himself pro se, the complaint is to be construed liberally. A pro se plaintiff may not however, rely solely on his complaint to defeat a summary judgment motion." *Miller v. McClure, et al.*, 2020 WL 1049750, *6 (W.D. Pa. Mar. 4, 2020) (citing *Anderson*, 477 U.S. at 256 ("Rule 56(e) itself provides that a party opposing a properly supported

motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.")).  *See also Bond v. State Farm Ins. Co.*, 2020 WL 4936967, at *3 (W.D. Pa. Aug. 24, 2020).  Allegations made without evidentiary support, however, may be disregarded.  *Jones v. UPS*, 214 F.3d 402, 407 (3d Cir. 2000); *see also Schoch v. First Fid. Reincorporation*, 912 F.2d 654, 657 (3d Cir. 1990) ("[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment.").  With these standards in mind, the Court will address the merits of the Defendants' motion.

VI.    Analysis and Discussion

A.    Exhaustion of Administrative Remedies

The Defendants seek summary judgment based on Simmons' failure to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997(e)a.  *See* ECF No. 113, p. 3.  Once a defendant raises exhaustion, the district court must consider it as a threshold matter.  *Chaney v. Bednard*, 2020 WL 7864202, at *4 (W.D. Pa. Dec. 31, 2020) (citing *Downey v. Pennsylvania Dep't of Corr.*, 968 F.3d 299, 304-05 (3d Cir. 2020) (citing *Woodford v. Ngo*, 548 U.S. 81, 88, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006); *see also Rinaldi,* 904 F.3d at 257. This exhaustion requirement applies to all claims relating to prison life that do not implicate the duration of the prisoner's sentence.  *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002).  The exhaustion requirement is not a mere technicality.  It is a requirement of federal law that district courts must enforce.  *Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000).

1.    Proper Exhaustion Under the Prison Litigation Reform Act

The Prison Litigation Reform Act requires proper exhaustion, meaning that an inmate must "complete the administrative review process in accordance with the applicable procedural rules." *Downey v. Pennsylvania Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020) (citing *Woodford,* 548 U.S. at 88)). These procedural rules are supplied by the individual prisons.  *Jones v. Bock*, 549 U.S. 199, 218, 127 S.

Ct. 910, 166 L.Ed.2d 798 (2007); *Spruill v. Gillis*, 372 F.3d 218, 222 (3d Cir. 2004) (determining whether "a prisoner has 'properly' exhausted a claim ... is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances"). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.' The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S., 107 U.S. at 217, 127 S. Ct. 910.

For inmates in the custody of the Pennsylvania Department of Corrections, DC-ADM 804 provides the relevant grievance procedures. The Court of Appeals for the Third Circuit recently summarized the applicable procedures in Pennsylvania:

> The DOC requires three stages of review to exhaust administrative remedies, including an initial written grievance, an appeal to the Facility Manager, and a final written appeal to the Secretary's Office of Inmate Grievances and Appeals (SOIGA). As relevant here, DOC regulations provide that each appeal to final review must be clearly labeled as an appeal at the top of the document, *id.* at § II.B.1.e.1, and that only one grievance may be appealed on a piece of paper unless combined by the Facility Manager, *id.* at § II.B.1.e.8. In addition, "[a]n inmate appealing a grievance to final review is responsible for providing the SOIGA with all required documentation relevant to the appeal. A proper appeal to final review must include: (1) a legible copy of the Initial Grievance; (2) a copy of the initial review response/rejection and/or remanded initial review response/rejection; (3) a legible copy of the Inmate Appeal to the Facility Manager; (4) a copy of the Facility Manager/designee's decision and/or remanded Facility Manager/designee's decision; (5) a written appeal to the SOIGA ...." *Id.* at § II.B.1.j (2015). "[F]ailure to provide any of the documentation noted above may result in the appeal being dismissed." *Id.* at § II.B.1.j.6.

*Cameron v. Swartz*, 810 Fed. Appx. 143, 145–46 (3d Cir. 2020) (citing DC-ADM 804); *see also Booth v. Churner*, 206 F.3d 289, 293 n. 2 (3d Cir. 1997), *aff'd* 532 U.S. 731, 121 S. Ct. 1819, 149 L.Ed.2d 958 (2001).

      2.      Proving the Affirmative Defense of Failure to Exhaust Administrative Remedies

The failure of an inmate to exhaust available administrative remedies is an affirmative defense that a defendant must plead and prove. *Jones v. Bock*, 549 U.S. 199, 216, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007); *Rinaldi*, 904 F.3d at 268 (citing *Ray v. Kertes, [Ray I]* 285 F.3d 287, 295 (3d Cir. 2002)). To establish this affirmative defense at the summary judgment stage, the moving party must produce a record demonstrating their entitlement to judgment on the defense as a matter of law. Fed. R. Civ. P. 56(c)(1)(A). The most efficacious means to do so is for the defendant to produce the plaintiff's entire grievance record. *See, e.g., Green v. Maxa*, 2019 WL 1207535, at *6 (W.D. Pa. Mar. 14, 2019); *Jackson v. Superintendent Greene SCI*, 671 Fed. Appx. 23, 24 (3d Cir. 2016).

Defendants may also provide an affidavit from a person with knowledge who affirms factually that the plaintiff failed to exhaust fully or properly. *See Fed. R. Civ. Pro.* 56(c)(4). This is often an affidavit from a records custodian. *See Wiggins v. Correct Care Solutions, LLC*, 2017 WL 11550519, at *5, 7-8 (E.D. Pa. May 9, 2017); *Muhammad v. Sec'y Pa. Dep't of Corrs.*, 621 Fed. Appx. 725, 727 (3d Cir. 2015) (affidavit attesting plaintiff failed to appeal to SOIGA); *accord Martin v. Pa. Dep't of Corrs.*, 395 Fed. Appx. 885, 886 (3d Cir. 2010) (affidavit stating plaintiff "never sought final review"). Defendants may not prevail on summary judgment, however, where they rely upon an affidavit that amounts only to a legal conclusion that the plaintiff failed to exhaust. *See Ray v. Kertes, [Ray II]* 130 Fed. Appx. 541, 543 (3d Cir. 2005) (rejecting summary judgment when SOIGA records custodian's declaration merely recites legal conclusions "mirroring the statutory language" and does not provide a factual report detailing the plaintiff's exhaustion efforts or lack thereof). But as the Court of Appeals recently explained, "if prison officials thwart a prisoner's ability to exhaust his

administrative remedies, those remedies are not considered 'available' within the meaning of §

1997e." *See Cameron*, 810 Fed. Appx. at 145 (citing *Ross v. Blake*, ⸺ U.S. ⸺, 136 S. Ct. 1850,

1860, 195 L.Ed.2d 117 (2016) (stating that exhaustion is not required "true when prison

administrators thwart inmates from taking advantage of a grievance process through machination,

misrepresentation, or intimidation."); *Brown v. Croak*, 312 F.3d 109, 113 (3d Cir. 2002).

3.    Simmons' Grievance Record

Both Simmons and the Defendants have filed documents, including a large number of

grievances, in support of their respective positions on exhaustion. The Defendants have also filed

an affidavit from a grievance records custodian. *See* ECF No. 115-3, p. 50 (Affidavit of Keri

Moore). In support of his contention that he exhausted his claims, Simmons has filed what appears

to be an institutional Grievance Log that summarizes all the grievances he filed from May 16, 2016

until October 24, 2017. ECF No. 123-17, pp. 2-4. Before turning to the merits of Simmons'

remaining claims, the Court will review the grievances relevant to those claims to ascertain whether

they have been properly exhausted.

a.    Count I – First Amendment Retaliation Claim

At Count I, Simmons alleges that "each defendant, individually and collectively," [10] retaliated

against him by filing false misconducts for filing grievances about the "racist conduct of staff." ECF

---

[10] Simmons uses this phrase in every count of the Complaint and supplements thereto. To the extent Simmons' use of
the word "collectively" could be construed as an attempt to raise a claim that all the Defendants acted in concert to
deprive Simmons of his constitutional rights, such a claim is dismissed as a matter of law. *See, e.g., Thompson v. Hens-Greco*,
2017 WL 3616669, *3 (W.D. Pa. July 28, 2017)(conspiracy claim where plaintiff alleged all defendants acted "individual
and collectively"), *report and recommendation adopted*, 2017 WL 3608223 (W.D. Pa. Aug. 22, 2017). To state a claim for
conspiracy, Simmons is required to show "'a combination of two or more persons to do a criminal act, or to do a lawful
act by unlawful means or for an unlawful purpose.'" *Id.* A conspiracy claim requires specific allegations "which are
particularized, such as those addressing the period of the conspiracy, the object of the conspiracy, and certain other
action of the alleged conspirators taken to achieve that purpose. It is not enough that the end result of the parties'
independent conduct caused plaintiff harm or even that the alleged perpetrators of the harm acted in conscious
parallelism. Rather, there must be a showing that the alleged conspirators directed themselves toward an
unconstitutional action by virtue of a mutual understanding or agreement. The United States Court of Appeals for the
Third Circuit has made clear that in light of *Twombly* and its progeny, there must be enough factual matter (taken as true)
to suggest that an agreement was made, in other words, plausible grounds to infer an agreement. The facts alleged must
raise a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."

No. 4, ¶ 113.  Simmons contends that as a result of the false misconducts, he was placed in the

Restricted Housing Unit (RHU) which subjected him to a "more harsh" (sic) environment, and that

he lost access to showers, the prison yard, and was placed in a dirty cell for a "long period of time."

ECF No. 4, ¶ 115.  A review of the grievance record makes clear that Simmons' retaliation claim has

not been exhausted.  Simmons does not provide a date for when the alleged retaliatory actions

occurred, leaving the Court to parse his claim and the summary judgment record for a point of

reference.

    A few grievances in the summary judgment record concern the incidents of racist language

alleged in Count I.  In Grievance No. 661144, submitted on January 18, 2017, Simmons states:

> On 1-14-2017 I was receiving a hair cut when this took place,
> Sgt. Yunkin and several other officers were laughing and
> joking about the death of a young black man (of Blackies as
> they call it).  Then went on to say if these stupid blacks in
> population keep assaulting guards, will keep burning there
> black buddys for there activities … when I spoke up the C/O
> and Sgt. Yunkin got angry and told me "its not a holiday inn
> … if it was up to me your kind would get nothing.  They
> went on a racist tyraid of insults about that's why Donald
> Trump is going to clean this country up and make America
> white again."

ECF No. 115-1, p. 18 (misspellings in original).  While this Grievance recounts the "racist conduct

of staff" referenced in the Complaint, it does not state that Simmons is being retaliated against, nor

does it mention the filing of a retaliatory misconduct charge.

    The same is true for a grievance Simmons filed on March 19, 2017.  There, Simmons grieved

that Defendant Core used racist language toward other inmates.[11]  *See* ECF No. 115-1, p. 44

---

*Id.* at *7 (citations and quotation marks omitted).  Here, Simmons alleges no facts to support a plausible inference that
the Defendants had a "mutual understanding or agreement" to violate his constitutional rights.  Thus, his pleadings do
not state a conspiracy claim.  *See id.*

[11] Simmons' grievance does not actually identify Defendant Core by name.  In responding, the Grievance Officer noted
this: "first and foremost, you made no attempt whatsoever to address your issue" with prisoner personnel.  ECF No.
115-1, p. 45.  The Initial Review Response then states that "the CO1 you are referring to is Officer Core, but you don't
need me to tell you this." *Id.*

(Grievance No. 669325). But again, no mention is made of any retaliatory actions taken against Simmons. Thus, these Grievances do not address the claims of retaliation stated in Count I. Although they may touch on certain aspects of Simmons' claim, they did not reasonably identify the factual basis for, or otherwise put prison officials on notice of, a First Amendment retaliation claim. Accordingly, they need not be analyzed further. *See, e.g., Ruby v. Rush*, 2019 WL 1318379, at *2 (W.D. Pa. Mar. 22, 2019). No other Grievance in the record concerns the retaliatory filing of a misconduct claim; therefore, Simmons has not properly exhausted his administrative remedies as to this claim. The Defendants' motion for summary judgment as to this claim will be granted.

b.    Count II – Exhaustion of First Amendment Claims

1.    Retaliation

As noted above, part of Count II can be interpreted as a retaliation claim. *See, supra.* Simmons alleges that Defendants Younkin, Gillespie, Hennessey, and Albonde retaliated against him for filing grievances. The Amended Count specifically stated that Defendant Hennessey "Denied me haircuts on 6-10-2017 for filing grievances against staff." ECF No. 46, ¶ 6. He also states that on December 31, 2016, Defendant Younkin "began a campaign of retaliation" against him.[12] *Id.*, ¶ 3. So construed, this claim is unexhausted.

Simmons points to Grievance No. 658599 as evidence that he exhausted his claim against Defendant Younkin. *See* ECF No. 46, ¶ 3. This Grievance, however, does not connect Younkin's denial of a haircut to Simmons' filing of grievances against staff members. Instead, the precise issue grieved is Simmons' belief that he properly requested barbershop services and that his request was denied because "it was not polite enough," not that Younkin denied Simmons a haircut as retaliation

---

[12] Defendant Younkin was identified as a Defendant in the original complaint, *see* ECF No. 4, ¶ 45, and the Defendants did not seek his dismissal in their motion to dismiss. *See* ECF No. 23, pp. 6-7. Thus, Simmons' claims against Younkin remain active.

for Simmons filing grievances.  ECF No. 115-1, p. 2. Thus, Simmons' retaliation claim against Defendant Younkin has not been exhausted.

Simmons has likewise not exhausted a First Amendment retaliation claim against Defendants Gillespie and Hennessey.  Simmons alleges that Defendant Hennessey denied him a haircut on June 10, 2017, for filing grievances against staff and that Defendant Gillespie taunted him about his inability to file a grievance about the denial.  ECF No. 46, ¶¶ 6-7.  Any retaliation claim against these two Defendants has not been exhausted and Simmons concedes as much.[13]  He argues instead that he was unable to file a grievance because he was on "grievance restriction."  *Id.*, ¶¶ 6-7.

But the mere fact that an inmate is placed on a grievance restriction does not render administrative remedies unavailable as the inmate is still permitted to file a limited number of grievances.  *See Cummings v. Crumb*, 347 Fed. Appx. 725, 727 (3d Cir. 2009).  And Simmons filed grievances on other matters during the months of June and July, 2017, in contravention of his claim that he was unable to do so.[14]  *See, e.g., Dunbar v. Barone*, 2012 WL 259982, at *7 (W.D. Pa. Jan. 27, 2012), *aff'd*, 487 Fed. Appx. 721 (3d Cir. 2012) (citing *Hopkins v. Apadaca*, 2011 WL 3882505, at *6 (W.D. Pa. Aug.3, 2011)).  Thus, being on a grievance restriction would not have prevented Simmons from exhausting his retaliation claims against Hennessey and Gillespie.  Rather, it simply limits an inmate to one grievance per every 15 days.  *Id.; see also Ball v. Oden*, 2012 WL 7162069, at *4 (M.D. Pa. Dec. 6, 2012), *report and recommendation adopted*, 2013 WL 634024 (M.D. Pa. Feb. 20, 2013).  He

---

[13] As pleaded, the retaliation claim against Defendant Gillespie is a stretch.  Simmons states only that "on the same day corrections officer Gillespie yelled up to my cell and stated, "what Simmons, no grievances in the door!  He began to laugh with c/o Hennessey saying "oh yea the dumb f**ks on grievance restriction!  Who you gonna cry to about haircuts now gondi [Gandhi]!!."  ECF No. 46, ¶ 7.  Simmons labels this exchange as "retaliation," and although unconnected to any allegation of actual retaliation, the Court will liberally construe this as such.

[14] The Grievance Log Simmons provided notes that he filed the following five grievances during June and July of 2017: No. 680711 (June 6, 2017); No. 682521 (June 16, 2017); No. 683859 (June 26, 2017); No. 686980 (July 14, 2017) and No. 688676 (July 27, 2017).  ECF No. 123-17, p. 4.

does not assert that prison officials rejected a grievance against Hennessey or Gillespie.  Therefore, Simmons' retaliation claims against Defendants Hennessey and Gillespie have not been exhausted.

2.      Free Exercise Claim

As amended, Simmons brings this claim against Defendants Albonde, Zaken, and Gilmore. ECF No. 46, p. 1, ¶ I.  The factual basis for Simmons' Free Exercise claim and the accompanying statutory claim is a delay or denial of haircut services.  Simmons first filed Grievance No. 658599 regarding the deprivation of a haircut on December 31, 2016.  ECF No. 115-1, p. 2.  There, he complained that Defendant Younkin denied him a haircut on that date because his "barshop (sic) request slip was not polite enough!"  *Id.*  Simmons' request merely stated "haircut, thank you."  *Id.* He grieved that this denial was the "3rd time out of 3 barbershops that have past this year."  *Id.*  He indicates that this denial of haircuts violated his religious beliefs.  *Id.*, p. 3.

This Grievance was received on January 3, 2017 and denied on January 19, 2017.  *Id.*, pp. 3. Simmons maintains that he appealed to the Facility Manager on January 22, 2017, and he has filed a one-page "Inmate Appeal to Facility Manager" form as evidence.[15]  ECF No. 123-8, p. 3.  Simmons also contends he submitted an appeal to SOIGA for final review in which he states that he had not received a response from the Facility Manager and that fifteen days had passed since requesting review.  *Id.*, p. 2.

No response from the Facility Manager or the SOIGA is part of the record and Defendants disagree that Simmons ever filed such appeals.  There is some support for the Defendants' position in the record.  Simmons himself has filed a Grievance Log which reveals that no appeal to the facility manager or to SOIGA was ever filed for Grievance 658599.  *See* ECF No. 123-17, p. 3. Defendants, however, provide nothing to further substantiate the accuracy of this Grievance log.

---

[15] By this date, Simmons had received a haircut.  *See* ECF No. 115-1, p. 18 (*See* Grievance No. 661144 wherein Simmons states "On 1-14-2017 I was receiving a haircut.").  Thus, this claim is factually predicated on a delay of a haircut for approximately two weeks.

They do point to the affidavit from the SOIGA official which specifically avers that "Plaintiff did not appeal Grievance 65899 … to final review." ECF No. 115-3, p. 50, ¶ 3.

That affidavit, however, provides tenuous support for exhaustion. As the Court of Appeals recently determined, where a grievance officer's affidavit sheds no light on the steps a prisoner takes to exhaust his final grievance, and instead simply states that the inmate "has not appealed" to the Secretary's Office, the affidavit is "insufficient to demonstrate the absence of a genuine issue of material fact concerning" whether the inmate's appeal to SOIGA was procedurally defective. *Cameron*, 810 Fed. Appx. at 146-147 (citing *Small v. Camden Cty.*, 728 F.3d 265, 271 (3d Cir. 2013) (stating that "[District] Court correctly placed the burden on Defendants to prove non-exhaustion"). The SOIGA affidavit in this case is in a similar vein. It says nothing about Simmons' purported appeals to the Facility Manager or the efficacy of his efforts to appeal to the Secretary's Office. Nor does it offer any information on the steps—proper or otherwise—that Simmons took in an attempt to appeal, and provides no explanation relating to the appeal forms Simmons submitted in opposition to summary judgment.

Considering Simmons' supporting documentation, the Court can only conclude that Defendants have not met their burden to show a failure to exhaust this claim as alleged against Defendant Younkin. *Spinney v. United States*, 2008 WL 1859810, at *6 (W.D. Pa. Apr. 23, 2008) (citing *Jones v. Bock*, 549 U.S. 199, 127 S. Ct. 910, 166 L.Ed.2d 798). Thus, the portion of this claim pertaining to an approximately two-week delay in receiving a haircut will be reviewed on its merits.

In addition to this two-week haircut delay, Count II alleges an additional delay and/or deprivation of haircuts over an ensuing period of months, also in violation of his religious beliefs. These allegations are brought against Defendant Hennessey, for denying a haircut on June 10, 2017, and against Defendant Albonde for denial of a haircut sometime in July of 2017. *See* ECF No. 46, ¶ 6-8. Simmons states that, at the time he made these requests, he "had gone 9 out of 12 months

without consistent haircuts, even though I repeatedly filed request slips to Sgt. Younkin for monthly haircuts." *Id.*, ¶ 9. Simmons acknowledges that he did not file grievances about these events, stating instead that he could not do so because he was on "grievance restriction."[16] *Id.*, ¶¶ 6-7.  As previously concluded, however, that assertion does not excuse Simmons from the exhaustion requirement.  Thus, any Free Exercise claim against Hennessey and Albonde has not been exhausted.[17]

### 3.    Statutory Claims

Simmons has additionally alleged that Defendants Younkin, Gillespie, Hennessey, and Albonde all violated his rights pursuant to the RLUIPA.  Because Simmons exhausted his claim against Defendant Younkin under the First Amendment, the statutory claim is deemed exhausted as well. *Cf. Dalie v. Pennsylvania Dep't of Corr.*, 2017 WL 3316265, at *4 (W.D. Pa. Aug. 3, 2017) (summary judgment will be granted on Plaintiff's claims that his rights under RLUIPA and the First Amendment's free exercise clause were violated because both claims were unexhausted). *See also Mack v. Yost*, 979 F. Supp. 2d 639, 650 (W.D. Pa. 2013) (discussing shared factual basis between First Amendment and RLUIPA claims), *aff'd in part, vacated in part, remanded sub nom. Mack v. Warden Loretto FCI*, 839 F.3d 286 (3d Cir. 2016).  For the same reasons discussed regarding his Free Exercise claim, Simmons has failed to exhaust his RLUIPA claim against the other Defendants.

---

[16] According to the Pennsylvania Department of Corrections Grievance Policy DC–ADM 804 Part IV.L, an inmate on grievance restriction is restricted to filing no more than one grievance every 15 days. Thus, being on grievance restriction would not have prevented Simmons from exhausting his remedies. *Dunbar v. Barone*, 2012 WL 259982, at *7 (W.D. Pa. Jan. 27, 2012), *aff'd*, 487 Fed. Appx. 721 (3d Cir. 2012)

[17] The only other grievance in the summary judgment record that mentions access to barbershop services is Grievance 669320. That Grievance is dated March 18, 2017 and was brought against Defendant Core. ECF No. 115-1, p. 39. Simmons stated that he inquired of Defendant Carter about "barbershop" on account of a scalp condition. *Id.* Defendant Core, while in the presence of a female trainee officer, yelled that the clippers were broken and that she was "glad" they were. *Id.* Simmons identifies the officers' behavior as a "constant issue" and asks that the officer be removed from H-Block "to preserve the peace and safety of the unit and for me to receive a hair cut due to my religious beliefs pertaining to hygiene." *Id.* The Grievance was denied as frivolous on initial review and that finding was upheld on appeal to the Facility Manager. *See id.*, pp. 40, 42. None of the Defendants mentioned in Count II are identified in this Grievance and, thus, it did not exhaust this claim as to any of them.

4.      Supervisory Liability Claims

Lastly in Count II, Simmons pleads a supervisory liability claim against Defendants Gilmore

and Zaken.  *See* ECF No. 4, ¶ 47; ECF No. 46, ¶¶ 12-16.  He claims that these Defendants were

made aware of his allegations of retaliation via the filing of request slips and grievances.  *Id.  See also*

ECF No. 4-20, p. 1; ECF No. 4-22, p. 1.  Irrespective of the exhaustion inquiry, this claim fails as a

matter of law.  Simmons cannot sue supervisory officials based solely on their supervisory status or

their processing of his past grievances.  A claim of a constitutional deprivation cannot be premised

merely on the fact that the named defendants were prison supervisors when the incidents set forth

in the complaint occurred.  Instead, to state a constitutional tort claim the plaintiff must show that

the supervisory defendants actively deprived him of a right secured by the Constitution.  *Morse v.*

*Lower Merion School Dist.*, 132 F.3d 902 (3d Cir. 1997); *see also Maine v. Thiboutot*, 448 U.S. 1, 100 S. Ct.

2502, 65 L.Ed.2d 555 (1980).  Constitutional tort liability is personal in nature and can only follow

personal involvement in the alleged wrongful conduct shown through specific allegations of

personal direction or of actual knowledge and acquiescence in the challenged practice.  *Robinson v.*

*City of Pittsburgh*, 120 F.3d 1286 (3d Cir. 1997).  With respect to prison supervisors it is well-

established that:

> "A[n individual government] defendant in a civil rights action
> must have personal involvement in the alleged wrongdoing;
> liability cannot be predicated solely on the operation of
> respondeat superior. Personal involvement can be shown
> through allegations of personal direction or of actual
> knowledge and acquiescence." *Rode v. Dellarciprete*, 845 F.2d
> 1195, 1207 (3d Cir. 1988).

*Johnson v. Holt,* 2015 WL 672127, at *13 (M.D. Pa. Feb. 17, 2015) (quoting *Evancho v. Fisher,* 423 F.3d

347, 353 (3d Cir. 2005)).  Thus, courts have frequently held that, in the absence of evidence of

supervisory knowledge and approval of subordinates' actions, a plaintiff may not maintain an action

against supervisors based upon the misdeeds of their subordinates.  *Id.* (citing *O'Connell v. Sobina*,

2008 WL 144199, * 21 (W.D. Pa. Jan.11, 2008)); *Neuburger v. Thompson*, 305 F.Supp.2d 521, 535 (W.D. Pa. 2004). Instead, "[p]ersonal involvement must be alleged and is only present where the supervisor directed the actions of supervisees or actually knew of the actions and acquiesced in them." *Jetter v. Beard*, 183 Fed. Appx. 178, 181 (3d Cir. 2006) (citation omitted).

Here, although Simmons points to two request slips in the record as evidence these Defendants had knowledge that other Defendants were denying him haircuts, he has not produced any evidence that Gilmore or Zaken directed the actions of their subordinates or acquiesced in them. Therefore, the claim against them as stated in Count II fails as a matter of law.

c.      Count III – Eighth Amendment Deliberate Indifference Claim

At Count III, Simmons claims that Defendant Chiovitti violated his rights under the Eighth Amendment by denying him psychological care from April of 2017 through June of 2017. ECF No. 4, ¶¶ 121-124. Chiovitti is a Psychological Services Associate at SCI-Greene.[18] *Id.*, ¶ 16. None of the grievances in the summary judgment record name or otherwise identify Defendant Chiovitti. Although the PLRA itself does not have a "name all defendants" requirement, Section 11(d) of the DOC's grievance policy states that the inmate "shall identify individuals directly involved in the events." *See Chaney v. Bednard*, 2020 WL 7864202, at *5 (W.D. Pa. Dec. 31, 2020) (citing *Byrd v. Shannon*, 715 F.3d 117, 127 (3d Cir. 2013)); *Green v. Maxa*, 2020 WL 1249205, at *5 (W.D. Pa. Mar. 16, 2020); and *Jackson v. Carter*, 813 Fed. Appx 820, 823 (3d Cir. 2020). Speaking to this requirement, the Court of Appeals has held that, "in the absence of any justifiable excuse, a Pennsylvania inmate's failure to properly identify a defendant constitute[s] a failure to properly exhaust his administrative remedies under the PLRA." *Williams v. Pa. Dep't of Corr.*, 146 Fed. Appx. 554, 557 (3d Cir. 2005).

---

[18] Some of the filings in this case use the last name of "Novak" to refer to Ms. Chiovitti. *See, e.g.,* ECF No. 115-3, p. 2 (Affidavit of Joseph R. Scotti, PhD). The Court, for sake of clarity, will refer to her using the last name Chiovitti, as that is how Simmons identifies her.

Simmons filed approximately twenty-nine grievances between April and June of 2017. ECF No. 123-17, pp. 2-4. However, he has not included any of the grievances filed during that period in the record or identified any as relating to the claim against Chiovitti. Grievance No. 696980, which is part of the record, was filed on July 13, 2017, but concerned neither Chiovitti nor psychological care. ECF No. 115-3, p. 27. Thus, this claim is not exhausted, and summary judgment will be granted to the Defendants.

        d.      Count VII – First Amendment Retaliation Claim against Defendants Carter and Imhof.

The last remaining Count of the Complaint—Count VII—alleges that Defendants Carter and Imhof retaliated against Simmons for his filing of grievances by requiring a strip search prior to him receiving yard privileges on various dates in June and July of 2017. ECF No. 4, ¶¶ 94-105, 135-137.[19] Grievance 686980, filed on July 13, 2017, appears to address this issue. *See* ECF No. 115-3, p. 27. There, Simmons grieves that Defendant Carter "command[ed] me to stand naked before he gets there to do the strip search." *Id.* He does not mention Defendant Imhof. *Id.* Simmons' grievance was denied on Initial Review on July 26, 2017. *Id.*, p. 28. Simmons has filed an Inmate Appeal to Facility Manager form referencing this Grievance inexplicably dated July 27, **2020** (emphasis added). ECF No. 123-13, p. 2. He has also submitted a form purporting to be his appeal to SOIGA on August 2, 2017.[20] *Id.*, p. 3. That final appeal was premature, given that he only appealed to the Facility Manager six days prior. *See Chaney*, 202 WL 7864202, at *5 (explaining that that after appealing for intermediate review, the facility manager has ten days to respond). The SOIGA official's affidavit attests that no appeal to final review of this grievance was received by

---

[19] Simmons' claims that these Defendants sexually harassed him was previously dismissed with prejudice. *See generally* ECF No. 40; ECF No. 45.

[20] In a declaration, Simmons re-states his allegations against these Defendants. *See* ECF No. 123-16, p. 4, ¶ 8. But this declaration, as well as another declaration by Simmons that is part of the record, makes no mention of Grievance 686980 or the steps he took to properly exhaust that grievance. *See also* ECF No. 123-1, pp. 2-3.

their office.  ECF No. 115-3, ¶ 2.  Further, Simmons' Grievance Log records that he received an

Initial Response to Grievance No. 686980 on July 26, 2017, but no appeal was ever taken.  *See* ECF

No. 123-17, p. 4.

But despite this, here again, the Defendants have not met their burden of proving the failure

to exhaust.  As noted previously, the SOIGA affidavit says nothing about Simmons' purported

appeals to the Facility Manager or the efficacy of his efforts to appeal to the Secretary's Office.  Nor

does it offer any information on the steps—proper or otherwise—that Simmons took in an attempt

to appeal, and provides no explanation relating to the appeal forms Simmons submitted in

opposition to summary judgment.  And Defendants have offered nothing to contradict Simmons'

filings that he did in fact file appeals to the Facility Manager and to SOIGA.  Thus, this claim will be

reviewed on its merits.

e.     Supplemental Count – Defamation Claim Against Defendants Gilmore and
Chiovitti

Simmons also brings a claim of state law defamation against Defendants Gilmore and

Chiovitti.[21]  ECF No. 80, ¶¶ 7-18.  To the extent that the Defendants contend this claim was also

unexhausted, their argument is misplaced.  Here, Simmons' allegation is that these Defendants

defamed him during this litigation by stating that he is a member of gang and that his religion is

merely an invented cover for gang-related activity.  *Id.*, ¶ 7.  But "the PLRA's exhaustion

requirement applies [only] to all inmate suits about prison life, whether they involve general

circumstances or particular episodes, and whether they allege excessive force or some other wrong."

---

[21] Simmons erroneously labels this claim as violative of the First and Fourteenth Amendments.  *See* ECF No. 80, p. 8.
He argues that by referencing a connection to gang-related activities in a motion to compel, these Defendants have
defamed his character and his religion.  *Id.* ¶ 7.  "[T]o make out a due process claim for deprivation of a liberty interest in
reputation, a plaintiff must show a stigma to his reputation plus deprivation of some additional right or interest"
guaranteed by the Constitution or state law.  *Id.* at 233-34 (emphasis omitted) (citation omitted); *see also Clark v. Township
of Falls*, 890 F.2d 611, 619 (3d Cir. 1989) ("[D]efamation is actionable under 42 U.S.C. § 1983 only if it occurs in the
course of or is accompanied by a change or extinguishment of a right or status guaranteed by state law or the
Constitution.").  *See also Simonson v. Borough of Taylor*, 2020 WL 7690559, at *4 (3d Cir. Dec. 28, 2020).

*Porter*, 534 U.S. at 532, 122 S. Ct. at 992.  Because the alleged defamation of Simmons' character does not relate to prison life, this claim need not be exhausted under the PLRA and will be reviewed on the merits, *infra*.

              f.       Simmons' argument regarding exhaustion under  DC-ADM 001 is unavailing.

Before taking up the merits of Simmons' exhausted claims, a brief discussion of his general argument in favor of exhaustion is warranted.  In large part, Simmons argues that where no grievance record is evident, none is needed to satisfy the PLRA's exhaustion requirement because he made "verbal complaints" about "abuse allegations to staff," thereby complying with DC-ADM 001.  ECF No. 122-1, p. 3, ¶ 2.  That policy provides an alternative means for a plaintiff to exhaust a claim based on an "assault."  *See, e.g., Bucano v. Austin*, 2017 WL 4563948, at *4 (W.D. Pa. Oct. 13, 2017) (citing DC-ADM 001).  Simmons argues, for example, that he verbally reported "abuse" in connection with his deliberate indifference claim to prison personnel.  *Id.*, ¶ 5.  He also contends that he made a "verbal allegation of inmate abuse" regarding the conditions of his confinement.  *Id.*, ¶ 9.  But Simmons misapprehends how DC-ADM 001 works.

DC-ADM 001 expressly provides that it is the policy of the DOC to ensure that "an inmate is not subjected to corporal or unusual punishment, or personal abuse or injury."  *Freeman v. Wetzel*, 2020 WL 6730897, at *11 (W.D. Pa. Aug. 6, 2020), *report and recommendation adopted*, 2020 WL 5362050 (W.D. Pa. Sept. 8, 2020).  The Policy DC-ADM 001 defines inmate "abuse" as follows:

    1.      Conduct by an employee, contractor, volunteer, or any individual who has business with or uses the resources of the Department that involves:

          a.      the use of excessive force upon an inmate;

          b.      an occurrence of an unwarranted life-threatening act against an inmate; or

          c.      an articulated verbal or written threat to inflict physical injury directed toward an inmate.

    2.      Excluded from this definition are:

          a.      conditions of confinement;

b.      claims of inadequate medical or intentionally denied medical care;

c.      harassment or nonperformance of a duty by a staff member; and/or

d.      abuse by another inmate, to include sexual contact.

*Freeman*, 2020 WL 6730897, at *11 (citing DC-ADM 001).

This policy does not excuse Simmons' failure to exhaust. First, the policy specifically excludes the type of claims Simmons has raised: conditions of confinement, inadequate medical care, the denial of medical care, and harassment by staff. Second, Simmons has not alleged abuse within the meaning of the Policy. Instead, he attempts to equate "abuse" with the conditions of his confinement (cell light being on 24 hours, for example) and deliberate indifference to his medical needs. ECF No. 122-1, ¶¶ 5, 9. This is not abuse as defined by the Policy. None of Simmons' claims allege excessive force, unwarranted life-threatening actions, or verbal or written threats to inflict injury. Thus, DC-ADM 001 does not provide him an avenue to exhaust his constitutional claims against the Defendants or excuse his failure to properly exhaust his claims.

g.      Summary

By way of summary on the issue of exhaustion, the Court concludes as follows:

1.      The First Amendment retaliation claim pleaded at Count I has not been exhausted. Summary judgment will be granted to the Defendants on that claim.

2.      At Count II, the claims relating to the approximately two-week delay in receiving a haircut are exhausted. Allegations concerning any other deprivations of haircuts have not been exhausted.

3.      The Eighth Amendment claim against Defendant Chiovitti at Count III has not been exhausted. Summary judgment will be granted on that claim.

4.      The First Amendment retaliation claim against Defendant Carter at

Count VII has been exhausted and will be reviewed on its merits.

The First Amendment retaliation claim against Defendant Imholf

has not been exhausted.  Summary judgment will be granted on that

claim.

The Court will now proceed to a review of the exhausted claims.

B.      Count II – 1st Amendment and Statutory Claims related to the denial of a haircut

Simmons brings both a Free Exercise Clause claim under the First Amendment to the

Constitution as well as a statutory claim under RLUIPA.  *See generally* ECF No. 46.  According to

Simmons, his religion requires that he maintain a particular degree of personal hygiene, which

includes regular, monthly haircuts.  *See, e.g.*, ECF No. 123-25, p. 4 (citing "page eighty-one pillar of

truth and guidance; Enochlan customs).  The Defendants argue that Simmons' beliefs about haircuts

cannot be "sincerely held" and ask the Court to conclude that his autogenous religion is "nothing

more than a front for gang recruitment and activity."  ECF No. 113, p. 13.  However, the Court

need not wade into this question because, even assuming Simmons' religious beliefs are sincerely

held, he has not shown that those beliefs were substantially burdened.

As stated above, the unexhausted portion of Simmons' free exercise claims concern a delay

in his receiving a haircut from December 31, 2016, until January 14, 2017.  The Supreme Court has

recognized that the First Amendment guarantees that all prisoners must be afforded reasonable

opportunities to exercise their religious freedom.  *Cruz v. Beto*, 405 U.S. 319, 322 n. 22, 92 S. Ct.

1079, 31 L.Ed.2d 263 (1972); *see also O'Lone v. Shabazz*, 482 U.S. 342, 348, 107 S. Ct. 2400, 96

L.Ed.2d 282 (1987) ("Inmates clearly retain protections afforded by the First Amendment, ...

including its directive that no law shall prohibit the free exercise of religion.") (other citations

omitted).  Put another way, "while prisoners retain the First Amendment right to a reasonable

opportunity to exercise their religious beliefs, those opportunities do not extend to every

conceivable religion-related demand that could be made by a prisoner." *Massaquoi v. Morris*, 2019

WL 543002, at *6 (M.D. Pa. Jan. 18, 2019), *report and recommendation adopted*, 2019 WL 524061 (M.D.

Pa. Feb. 11, 2019) (citations omitted).  Only beliefs which are both sincerely held and religious in

nature are entitled to constitutional protection. *Id.* (citing *Cruz*, 405 U.S. at 322, 92 S. Ct. 1082).

Additionally, although incarcerated individuals retain certain protections afforded by the

First Amendment, "lawful incarceration brings about the necessary withdrawal or limitation of many

privileges and rights, a retraction justified by the considerations underlying our penal system."

*O'Lone,* 482 U.S. at 348, 107 S. Ct. at 2404 (quotations omitted).  Thus, while the federal courts must

recognize valid constitutional claims of prison inmates, the Supreme Court repeatedly has cautioned

that the task of prison administration has been committed to the responsibility of the legislative and

executive branches of government; federal courts should be reluctant to second guess these

authorities.  *See, e.g., Turner v. Safley*, 482 U.S. 78, 84, 107 S. Ct. at  2259 (1987).

The free exercise inquiry asks whether government has placed a substantial burden on the

observation of a central religious belief or practice and, if so, whether a compelling governmental

interest justifies the burden.  *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699 (1989) (internal

citations omitted).  Thus, to overcome summary judgment on a Free Exercise claim, a plaintiff must

first show that the Defendants substantially burdened that exercise. *Thomas v. Review Bd.*, 450 U.S.

707, 718, 101 S. Ct. 1425, 67 L.Ed. 624 (1981); *Wisconsin v. Yoder*, 406 U.S. 205, 218, 92 S. Ct. 1526,

32 L.Ed.2d 15 (1972).  This is a threshold question.  *Robinson v. Superintendent Houtzdale SCI*, 693 Fed.

Appx. 111, 115 (3d Cir. 2017).

Simmons has not shown that a two-week delay in receiving a haircut burdened his

sincerely held religious beliefs.  Instead, he argues generally that among the precepts of his religion is

the requirement to maintain proper personal hygiene.  In Book Two of his religious monograph, for

example, Simmons writes:

> Collecting your thoughts while cleanzing (sic) your body: the
> most important part of this ritual for any Spiritual Scientist is
> collecting ones thoughts before prayer.  The key to doing this
> is to find all those negative thoughts and trash them mentally,
> while washing your body clean of dirt and grime before you
> call upon the creators full sight.  You must take a full bath or
> full shower then properly dry your physical tomb and move
> to the next step of preparation.

ECF No. 115-2, p. 84.  The necessity or frequency of haircuts is not mentioned.  Further mentions

are made of the importance of Spiritual Scientists caring for their "body on a daily bases (sic)."  *Id.*,

p. 115.  And Simmons' work sets out a detailed "Trinity health and care campaign" which includes

an exercise regimen and dietary advice, but the document does not speak to the frequency of

haircuts or specify a schedule for other personal grooming requirements.  *See e.g., id.*, pp. 120-124.

Simmons' point is that haircuts are included in his religion's requirements of personal

hygiene.  Even so, Simmons has not met his burden to establish that the two-week delay in receiving

a haircut in early 2017 substantially burdened his freedom to the exercise his religion.  The

Defendants motion for summary judgment on this claim will be granted.

Summary judgment will also be granted on Simmons' RLUIPA claim.  Once again, Simmons

has not met his burden of production.  Under RLUIPA, Simmons bears the "initial burden" of

showing that (1) he has a sincerely held religious belief in obtaining a haircut and (2) the prison

substantially burdened the exercise of this belief by denying him one for two weeks.  *See Watson v.*

*Christo*, 2020 WL 7054443, at *2 (3d Cir. Dec. 2, 2020) (citing *Holt v. Hobbs*, 574 U.S. 352, 360-61,

135 S. Ct. 853, 190 L.Ed.2d 747 (2015); *see also* 42 U.S.C. § 2000cc-1(a)).  As with his free exercise

claim, the Court will not question the sincerity of Simmons' beliefs.  But he has not established the

statutory requirement that the prison substantially burdened that belief.  *See Maier v. Pall*, 2014 WL

1912194, *13 (M.D. Pa. May 13, 2014).  Such a burden exists where:

> 1) a follower is forced to choose between following the
> precepts of his religion and forfeiting benefits otherwise
> generally available to other inmates versus abandoning one of
> the precepts of his religion in order to receive a benefit; [or]
> 2) the government puts substantial pressure on an adherent
> to substantially modify his behavior and to violate his beliefs.

*Papa v. Chester Cty. Prison*, 2013 WL 373168, at *3-4 (E.D. Pa. Jan. 31, 2013) (citing *Washington v. Klem*, 497 F.3d 272, 280 (3d Cir. 2007)).  Simmons has established neither of these.  He points to no evidence in the record showing that he was forced to choose between his religion and a generally available benefit.  Indeed, he himself acknowledges receiving a haircut on January 14, 2017, and has not provided any evidence that was forced to abandon or otherwise push aside his religious beliefs in the preceding two-weeks.  Nor is there any evidence that the prison put "substantial pressure" on Simmons to modify his behavior in contravention of his religion.  Instead, the record demonstrates that the Defendants facilitated Simmons' request.  In responding to the grievance Simmons filed concerning the denial of his haircut on December 31, 2016, the grievance officer indicated that Simmons should "submit a request to Sgt. Younkin for a haircut and you will receive a haircut." ECF No. 115-1, p. 4.  And, Simmons acknowledges receiving a haircut two weeks later.  ECF No. 115-1, p. 18.  Simmons cannot establish that a two-week delay in receiving a haircut violated his religion's hygienic precepts and therefore the Defendants' motion for summary judgment will be granted on this claim.

      C.       Count VII – First Amendment Retaliation Claim against Defendants Carter and Imholf.

At Count VII, a First Amendment retaliation claim against Defendants Carter and Imholf remains.  As noted, Simmons claims he was retaliated against for his filing of grievances by being forced to undergo a strip search prior to receiving yard privileges on various dates in June and July of 2017.  ECF No. 4, ¶¶ 94-105, 135-137.  Simmons also contends that these Defendants issued a false misconduct report against him and confined him to a continuously lit cell.  *Id.*, ¶¶ 103-104.

The First Amendment to the United States Constitution reads in part that "Congress shall make no law ... abridging the freedom of speech ...; or the right of the people ... to petition the government for a redress of grievances." U.S. Const. amend. I. "In order to establish illegal retaliation for engaging in protected conduct, [a plaintiff] must prove that: (1) his conduct was constitutionally protected; (2) he suffered an adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to discipline him." *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016) (footnotes omitted) (citing *Rauser v. Horn*, 241 F.3d 330, 333-34 (3d Cir. 2001)). While causation can be established by direct or circumstantial evidence, "motivation is almost never subject to proof by direct evidence." *Id.* Retaliatory motivation is thus typically shown by "evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link." *Id.* Even where a plaintiff establishes a prima facie case of retaliation, "prison officials may still prevail if they establish that 'they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest.'" *Id.* (quoting *Rauser*, 241 F.3d at 334).

The Defendants argue that Simmons cannot establish retaliation against these Defendants because their actions were reasonably related to a penological interest, and because Simmons did not contest the misconduct charge against him. *See* ECF No. 113, p. 19. The Court agrees. Although Simmons alleges that he was denied yard privileges in retaliation for filing grievances, he contradicts himself by pleading he was denied yard privileges because "he wasn't standing naked at his cell door as required by" Carter and Imholf. ECF No. 4, ¶ 100. And in Grievance No. 686980, Simmons states that he was denied yard privileges because an officer was "commanding me to stand at my door naked before he gets there to do the strip search." ECF No. 123-1, p. 4. Thus, by Simmons'

own admission, his retaliation claim against Carter and Imholf is not based on the filing of grievances, but instead on his failure to comply with a strip search. So construed, the claim fails.

"[I]f a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct,' and cannot proceed beyond step one" of the retaliation analysis. *See Turner*, 482 U.S. at 89 (holding that a prison regulation that "impinges on inmates' constitutional rights" is nevertheless valid if that regulation "is reasonably related to legitimate penological interests"). "A prisoner's behavior in violation of prison regulations, including insolence, is not 'protected conduct' under the First Amendment." *Quinn v. Retort*, 2020 WL 5798040, at *7 (N.D. Ohio Sept. 28, 2020 (citations omitted)); *see also Armstrong v. Furman*, 2020 WL 5545270, at *5 (W.D. Pa. Sept. 16, 2020) (noting that a clear and overt violation of prison regulations could preclude a genuine dispute of material fact on the same-decision defense)).

The Supreme Court has made clear that strip searches are permissible in prisons as long as they are conducted in a reasonable manner. *Bell v. Wolfish*, 441 U.S. 520, 559–60, 99 S. Ct. 1861, 60 L.Ed.2d 447 (1979). Officials at SCI-Green have a legitimate penological interest in maintaining institutional security by conducting routine strip searches of inmates. *See, e.g., Cook v. Corbett*, 2015 WL 4111692, at *5 (E.D. Pa. July 8, 2015). Simmons was denied access to the prison yard because he refused to comply. He makes no argument that the strip search was conducted in an unreasonable manner. Indeed, while Simmons quotes DOC policy which requires that he "lay each item of clothing on the wicket for the officers to check for contraband," he also states that he continued to wear his boxer shorts when the officer approached. ECF No. 115-3, p. 27. Boxer shorts are articles of clothing and Simmons therefore had not complied with prison policy. Thus, any retaliation claim based on a strip search fails.

The "filing of a grievance to complain about [a corrections officer's] behavior is constitutionally protected conduct," *see Robinson v. Taylor*, 204 Fed. Appx. 155, 156 (3d Cir. 2006); *cf.*

*Mitchell v. Horn*, 31 F.3d 523, 530 (3d Cir. 2003), and receiving a prison misconduct which results in sanctions or loss of privileges usually amounts to an adverse action, *see Watson v. Rozum*, 834 F.3d 417, 423 (3d Cir. 2016)." *Lee v. Clark,* 2020 WL 8768344, at *9 (W.D. Pa. Dec. 14, 2020), *report and recommendation adopted*, 2021 WL 630961 (W.D. Pa. Feb. 18, 2021).  But here, Simmons has failed to establish any retaliatory adverse action.

The summary judgment record establishes that Simmons received three misconduct charges during the relevant period of time: misconduct 039617 (ECF No. 115-3, p. 6); misconduct 039618 (ECF No. 115-3, p. 13); and misconduct 006792 (ECF No. 115-3, p. 22).  Only one of these charges was issued by Defendant Carter, and is therefore relevant to this claim.  In misconduct charge 006792, Simmons was charged with trying to keep other inmates from returning their meal trays and he pleaded not guilty to this charge.  ECF No. 115-3, pp. 22-25.  As to this charge, there is nothing in the record that Carter asserted this misconduct charge falsely or that he falsified evidence to support it.  *See, e.g., Preacher v. Overmyer*, 2020 WL 43420, at *5 (W.D. Pa. Jan. 3, 2020) (citing *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017).  Furthermore,  there is no evidence, direct or circumstantial, that Carter had any retaliatory motive for submitting her misconduct charge. Nothing in the record shows that Carter had exhibited hostility towards Simmons based upon his filing of grievances, and the record lacks and evidence that Simmons asserted any grievance or lawsuit against Carter in response to which he allegedly retaliated.  Absent such evidence, Simmons' First Amendment retaliation claim against Carter also fails.  *See Preacher*,  2020 WL 43420, at *5.

However, the Court will deny Defendants' motion for summary judgment as to Simmons' claim that he was retaliated against by being placed in a cell with continuous illumination.  Simmons has alleged that he was "placed in FB7 cell, and FB2 cell both cells are hard cells with really bright lights that never turn off and no lite (sic) switch in the cell.  Plaintiff has complained about this condition of confinement but all staff does mainly c/o Carter and Imholf is laugh and state 'you'll

need all the light you can get to write your grievances.'" ECF No. 4, ¶ 104. Simmons has also

submitted a DC-135A form (Inmate's Request to Staff Member) dated July 4, 2017, in which he asks

why he has been placed in cells in which the "cell's light never turn off and have no light switches,"

rendering it "impossible for me to sleep at night." ECF No. 4-27, p. 1. The Defendants' argument

consists of one sentence faulting Simmons for not pointing to any "evidence linking any placement

in a 'hard cell' with Defendants or any retaliatory motive." ECF No. 113, p. 20.

On the current record, a genuine dispute of material fact exists concerning this claim. First,

the filing of grievances is constitutionally protected conduct. *See Robinson v. Taylor*, 204 Fed. Appx

155, 157 (3d Cir. 2006). And second, confinement to a continuously lighted cell could be adverse

action. *See Bracey v. Price*, 2012 WL 849865 (W.D. Pa. March 13, 2012) (holding that although

plaintiff's transfer into a "hard cell" for three days "appear objectively de minimus for an inmate

already confined in administrative custody [,] ... under existing law, ... [it] may be sufficient ..." to

send to the factfinder). If retaliation is established, the burden then shifts to the defendant prison

officials to "establish that 'they would have made the same decision absent the protected conduct

for reasons reasonably related to a legitimate penological interest.'" *Baez v. Mooney*, 2021 WL

816013, at *3 (W.D. Pa. Feb. 8, 2021), *report and recommendation adopted*, 2021 WL 808726 (W.D. Pa.

Mar. 3, 2021). Here, the record is undeveloped regarding the reason for Simmons' transfer to a

"hard cell," and Carter and Imhoff's alleged statement regarding Simmons' need for illumination to

file grievance supports a plausible inference of retaliatory motive. Accordingly, summary judgment

will be denied as to this claim against Carter and Imhoff.

D.      State Law Defamation Claim Against Defendants Chiovitti and Gilmore.

Lastly, Simmons alleges a claim of defamation under state law against Defendants

Chiovitti and Gilmore. *See* ECF No. 80. He claims that these Defendants defamed him when, in

documents such as a motion to compel Simmons to answer interrogatories, they stated that

"Plaintiff is a high-ranking gang member, and Defendants have reason to believe that the "religion" he invented is actually an attempt at gang leadership." *Id.*, p. 2 (referencing ECF No. 50, ¶ 2).

Simmons' state law defamation claim is barred by the litigation privilege and, therefore, fails as a matter of law. Simmons bases his claim only on statements made in court documents. *See generally* ECF No. 80. "Pennsylvania, like many other jurisdictions, recognizes a judicial [litigation] privilege providing immunity for communications which are made in the regular course of judicial proceedings and are material to the relief sought." *Schanne v. Addis*, 121 A.3d 942, 947 (Pa. 2015). The privilege covers statements made by parties, witnesses, attorneys, or judges. *Id.* "[T]he privilege is absolute, meaning that, where it attaches, the declarant's intent is immaterial even if the statement is false and made with malice." *Id.* at 947 (citing *Bochetto v. Gibson*, 860 A.2d 67, 71 (Pa. 2004)). The judicial privilege is not limited to statements made in open court but encompasses pleadings as well. *Post v. Mendel*, 507 A.2d 351, 353 (Pa. 1986); *see also Stein v. City of Philadelphia*, 2013 WL 6408384, at *6 (E.D. Pa. Dec. 5, 2013) ("Parties in litigation are given an absolute privilege with regard to statements that relate to a judicial proceeding if the communications are preliminary to, instituting, or part of the proceeding."). Simmons has not identified or produced evidence of any defamatory statements made outside of court proceedings. His lone alleged defamatory reference is that these Defendants associated him (and his religion) with gang activity. Simmons expressly acknowledges that these statements were made in court documents. Courts have also concluded that discovery proceedings, such as interrogatories and depositions, are "part of the regular course of proceedings," and therefore, covered by the privilege. *See, e.g., Schatzberg v. State Farm Mut. Auto. Ins. Co.*, 877 F. Supp. 2d 232, 247 (E.D. Pa. 2012). *See also Grey v. Johansson*, 2016 WL 1613804, at *5–6 (E.D. Pa. Apr. 22, 2016). Accordingly, Defendants Chiovitti and Gilmore are entitled to judgment as a matter of law on Simmons' defamation claim.

VII.     Conclusion

      The Defendants' motion for summary judgment is GRANTED in part and DENIED in part.  The motion is DENIED as to Plaintiff's First Amendment retaliation claim against Defendants Carter and Imhoff based on Plaintiff being placed in a "hard cell" with continuous illumination. In all other respects the motion is GRANTED, and all other claims are dismissed.  The Clerk of the Court is directed to terminate all remaining Defendants except Carter and Imhoff.

Dated: March 31, 2021

                                      RICHARD A. LANZILLO
                                      United States Magistrate Judge